**Fernando VARGAS FIGUEROA, Plaintiff,**

v.

**Jose M. SALDANA, et al., Defendants.**

**Civ. No. 86–1433(PG).**

United States District Court,
D. Puerto Rico.

Oct. 10, 1986.

---

Eliezer Aldarondo, Hato Rey, P.R., for plaintiff.

James D. Noel, III, Hato Rey, P.R., for defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

This is a civil rights action brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, in which plaintiff alleges that defendants deprived him under color of state law of his rights under the First, Fifth and Fourteenth Amendments to the Constitution of the United States. Plaintiff asserts that he was removed from his position as Head of the Department of Physiology of the School of Medicine of the University of Puerto Rico because of political and national origin reasons. Plaintiff is claiming damages and reinstatement in his position as Head of the Department of Physiology.

This Court has jurisdiction over the subject matter of the complaint under 28 U.S.C. §§ 1331 and 1343(3) and (4).

On September 10, 11, and 12, 1986, a hearing was held before this Court on plaintiff's request for preliminary injunction. Based on the evidence presented at the hearing we reach the following findings of fact and conclusions of law.

### Findings of Fact

Plaintiff, Dr. Fernando Vargas, born and raised in Chile, is a citizen of the United States. He is a well known scientist in the international community with over 70 publications. He has a D.D.S. from the University of Chile and a Ph.D. in physiology and physical chemistry from the University of Minnesota. Plaintiff, however, has no local political affiliation.

Defendant Dr. José M. Saldaña is the present Chancellor of the Medical Sciences Campus of the University of Puerto Rico (UPRMSC). He is an active member of the Popular Democratic Party (PDP) with participation in advisory committees. Dr. Saldaña and Dr. Nydia de Jesús, the present Dean of the School of Medicine of the UPRMSC, removed Dr. Fernando Vargas

as Head of the Department of Physiology. Defendant Dr. Manuel Martínez Maldonado was Acting Director of the Department of Physiology of the School of Medicine of the UPRMSC from 1973 to 1979 and member of the PDP. He was again appointed to that position after the removal of Dr. Vargas. All of the above defendants were sued in their individual and official capacities.[1]

The other codefendant is the University of Puerto Rico. However, the complaint against the University was dismissed since the University was immune from suit under the Eleventh Amendment. (See our Opinion and Order of October 8, 1986).

On September 1980, Dr. Fernando Vargas was appointed Associate Professor and Head of the Department of Physiology. The department had been without a permanent chairman since 1973. Dr. Vargas came to know about the position through a science journal sending his curriculum vitae to the appropriate University committee. On January 1980 he received an invitation to visit the campus and conduct various seminars on his specialty and to be interviewed for the position. Before coming to Puerto Rico, Dr. Vargas did not know anyone at the University. After his nomination went through the Department of Physiology, the Dean of the School of Medicine and the Chancellor of the UPRMSC, in accordance with the regulations of the School of Medicine, he was appointed to that position.

At the outset, Dr. Fernando Vargas encountered difficulties with Dr. Manuel Martínez Maldonado and the latter's colleague, Dr. Susan Opava Stitzer. Dr. Manuel Martínez Maldonado assumed an attitude of arrogance by pretending to exercise authority at the Department of Physiology. On one occasion, for example, Dr. Martínez Maldonado invited Dr. Burg to come from Maryland and give a series of seminars at the Department of Physiology. Dr. Martínez Maldonado arranged a detailed program of activities including meetings with the students, faculty, and the Head of the Department. This program was initiated and programmed without consulting Dr. Fernando Vargas (Plaintiff's Exhibits 7 and 8).

Animosity between Dr. Vargas and Dr. Martínez Maldonado further increased when Dr. Vargas removed Dr. Martínez Maldonado as coordinator of a chapter of renal physiology. Dr. Martínez Maldonado was a full-time nephrologist and physician at the Veterans Administration Hospital, which seems to prevent him from performing his duties as coordinator of this chapter. Dr. Martínez Maldonado taught only two or three hours in the semester, did not attend departmental meetings and was not available to students for questions (Plaintiff's Exhibit 6).

Another incident occurred at a faculty meeting held on January 27, 1984. At said meeting a discussion was opened on the reasons why a high number of medical students flunked exams. At the meeting Dr. Manuel Martínez Maldonado stated that this failure rate of students was caused by an insufficient number of native Puerto Ricans teaching basic sciences. He urged the School of Medicine to fill up new positions with native Puerto Ricans. These remarks evidently implied a lack of professional integrity on the part of non-native Puerto Ricans and was certainly an unwarranted and shameful attack on non-native Puerto Ricans. The next day a poster was put on plaintiff's door at the Department stating:

"Evidence mounting quickly Non-P.R. professors Guilty

Ad Hoc Committee: Expel Them All!" (Plaintiff's Exhibit 19).

Other similar posters were put throughout the Department.

During that time, Dr. Bernstein, a Jewish professor born and raised in Chile, was physically attacked by Dr. García Palmieri, a member of the Faculty Promotions Com-

---

**1.** At the preliminary injunction hearing, defendant Fernando Agrait, President of the University of Puerto Rico, was dismissed from the complaint. The appointment or removal of a department chairman is not the responsibility of the President of the University of Puerto Rico.

mittee at the time of Dr. Vargas tenure decision.[2] Apparently, Dr. Bernstein had written a letter ·complaining of Dr. Martínez Maldonado's remarks, which prompted Dr. García Palmieri to insult Dr. Bernstein, hit him on the neck and threaten to kill him. Dr. Bernstein pressed charges to the police but withdrew them when Dr. García Palmieri apologized.

With regards to Dr. Susan Opava Stitzer, Dr. Vargas also had problems when he came to the Department where Dr. Susan Stitzer was a member. On February 1981, Dr. Susan Stitzer was transferred by Dr. Norman Maldonado, the Chancellor of the UPRMSC at the time, to the Department of Pharmacology. Although Dr. Fernando Vargas did not participate in the decision, he did know there were problems between Dr. Stitzer and the Department and wanted the problems solved. As a result of the transfer, Dr. Susan Stitzer brought an action in this Court alleging sex discrimination. Said complaint was dismissed, however, on *res judicata,* collateral estoppel and comity grounds since the administrative agency in charge and the Superior Court of Puerto Rico had reached a decision on the merits. *Susan Opava Stitzer v. University of Puerto Rico,* 617 F.Supp. 1246 (D.P.R.1985).

Dr. Vargas also encountered problems with Dr. Susan Stitzer's husband, Dr. Kent Stitzer, who opposed Dr. Vargas' bid for tenure. At the Faculty Promotions Committee Dr. Kent Stitzer made a series of accusations which Dr. Vargas was not permitted to rebut. Among the accusations made, Dr. Kent Stitzer complained that the Department of Physiology gave preferential treatment to Chileans and South Americans.[3] Dr. Brush and Dr. Keene,

members of said committee, objected to the accusations and the lack of process due to Dr. Vargas (Plaintiff's Exhibits 39–40). After some delay the tenure was finally approved by said committee. However, a decision on the tenure by the Administrative Board has yet to be reached.[4] The tenure recommendation has been before the Administrative Board for over a year (Defendants' Exhibit E). Part of the delay was caused by Dr. Susan Stitzer's proposal on May 7, 1985, to postpone consideration of Dr. Vargas' tenure until September 1985, when he was to complete his five years as associate professor. Tenure is given to professors who have given five years of satisfactory work (Article 14, Section 14.1, General Regulations of the University of Puerto Rico, December 1978, Plaintiff's Exhibit 42). Dr. Pedro Santiago Borrero, however, testified that under the rules and customs of the University consideration of the tenure is permitted after four years of academic service. This was done in order to insure that if a favorable decision was reached, the professor could have tenure at the completion of the five years. Dr. Pedro Santiago Borrero was the Dean of the School of Medicine of the UPRMSC from 1978 to 1985.

The tenure decision was also delayed because the Administrative Board requested the Office of the President of the University for an interpretation of the rules and regulations concerning the granting of tenure to professors who occupied administrative positions (Minutes of Administrative Board's Ordinary Meeting, October 8, 1985, Defendants' Exhibit E). Said delay, however, was a gimmick to harass Dr. Vargas. The rules and regulations which were the concern of the Administrative Board were

---

**2.** Before tenure is granted by the University's Administrative Board, which is the final nominating authority, a favorable decision on the tenure must be reached by the following committees and officials: 1) Department Promotions Committee; 2) the Faculty Promotions Committee; 3) the Dean of the School of Medicine; and 4) the Chancellor of the U.P.R.M.S.C.

**3.** The only native from Chile contracted by plaintiff was Dr. Albert Politoff Lifchitz, of Jew-

ish origin and who was a U.S. citizen. The other professors contracted by Dr. Vargas were the late Richard Durbin, an American physiologist, and Nelson Escobales, an outstanding young Puerto Rican scientist.

**4.** A favorable decision on the tenure was reached at the previous four steps of the process. See Footnote 2.

approved April 1, 1981, and were not applicable to Dr. Vargas. Dr. Vargas entered the University on September 1980 and therefore his tenure decision was under the protection of the Rules and Regulations of the University of Puerto Rico, approved on December 2, 1978. Under said regulations Dr. Vargas completed the minimum requirement of five years. Article 14, Section 14.7 states:

The members of the teaching personnel to whom are assigned administrative functions or additional tasks, such as President of the University, Chancellor, Dean, Director of an institutional unit, chief of division, assistant to executive official and other analogous administrative positions, will not acquire tenure for the performance of such functions and additional tasks, although they will acquire tenure for their teaching as professors.

Dr. Vargas actively participated as a professor in the University, devoting two-thirds of his time to teaching and researching. The other third he spent in his administrative duties. Moreover, other professors who testified on Dr. Vargas' behalf and the documentary evidence on record attest to the never ending scientific spirit of Dr. Vargas, who would spend weekends and evenings working in the laboratory.

On November 6, 1984, Puerto Rico held gubernatorial and general elections. In these elections, New Progressive Party (NPP) candidate and incumbent governor, Carlos Romero Barceló, lost to PDP candidate, Rafael Hernández Colón.

Dr. Fernando Vargas was removed by Dr. Saldaña from his position as Head of the Department on August 15, 1986, on the recommendation of Dr. Nydia de Jesús. After the removal, Dr. Vargas asked Dr. de Jesús the reasons for his dismissal. Dr. de Jesús referred to an evaluation done on the Department by members of other departments as part of the reasons for his removal. Dr. de Jesús refused to give the report to Dr. Vargas because she felt the report was confidential. (The report was finally introduced at trial as Plaintiff's Exhibit 50) Dr. Borrero testified, however, that nothing in the custom and regulations of the University suggested that such a report was confidential. A review of the regulations attest to the same conclusion.

At trial, Dr. Nydia de Jesús also testified that the Department of Physiology needed effective leadership to deal with the personality problems of the Department and that she felt Dr. Vargas was clearly unsuccessful in this matter. In obvious contradiction to her concern for the Department, Dr. Nydia de Jesús removed Dr. Vargas and appointed Dr. Manuel Martínez Maldonado as Interim Chairman of the Department of Physiology. As shown by the following exchange between Dr. Nydia de Jesús, attorney Nigaglioni (defendants' counsel) and the Court the reasons given by Dr. de Jesús were just a pretext to remove Dr. Vargas from his position.

BY MR. NIGAGLIONI:

Q Why didn't you consider Doctor Bernstein?

A Because Dr. Bernstein also is one of the members of the faculty that was in conflict with other members of the faculty.

BY THE COURT:

Q Was not Doctor Martinez also in conflict with the Chairman?

A Well, Doctor Martinez Maldonado was—had sort of separated himself for quite a while from the Physiology.

Q No, but in 1983 he certainly caused a lot of waves at the Department, did he not?, with his statements to the whole faculty?

A Yes, I recognize that, but in terms of the curriculum vitae, and capabilities of Doctor Martinez Maldonado, and previous experience of 6 or 7 years with the faculty.

Q With only two or three hours dedication, I mean, weren't you looking for somebody that could really straighten up that Department while you found somebody permanent?, and yet you go and pick up somebody who is a full staff of another hospital, who can only dedicate two or three hours, doesn't go to the

staff meetings, stuff like that. Is that what you are trying to tell me?

A He is Acting Chairman and he was not going to be considered for full position.

Q I know that, but I mean, you had a problem for six years, and you removed Doctor Vargas because of that, and you would bring in somebody, who at least you can hope that will solve some of those problems while you get a permanent person, right, is that correct?

A Yes.

Q And then you pick somebody who is almost foreign to that department because he is full time at some other hospital, he can only dedicate very few hours, and yet you have somebody who has created a big foul in the department, and you have a person full time there, who was previous Acting Chairman, and you did not consider him. Wasn't there some other motive involved?

A No, just what I mentioned, I considered that there should be a member not from the faculty, not from the faculty at that time, because of the internal conflicts that the Department was having, that we should have somebody from outside. I learned about—

Q Let me ask you this, did any of these reports reflect the fact that Doctor Martinez did not recognize the authority of Doctor Vargas as Chairman?

A Not in my reports.

Q But didn't you see any letters or anything like that to that effect?

A I was not aware of the expressions that were mentioned in that meeting.

Q In the 1983 faculty meeting?

A In the 1983 faculty meeting, I was not aware of that.

Q You did not hear bout them?

A When I hear it here.

Q But you had not heard it before?

A No.

Q You did not hear about the posters telling all of the foreigners to get out?, that was not the vox populi in the School of Medicine?

A Not to my knowledge.

Q Not to your knowledge.

A In 1983 I was mostly at the Puerto Rico Medical Center.

Q Didn't you read in the Dean's files letters from Doctor Vargas, complaining that Doctor Martinez would not adhere to his authority, that he thought he was the head over there, and was doing things like setting up programs without consulting with him?, that wasn't in the Dean's files?

A It could have been, I couldn't read them all.

Q I see. Go ahead.

MR. NIGAGLIONI: That will be all Your Honor.

After Dr. Vargas was removed from his position, six members of the Department of Physiology sent a letter to Dr. Saldaña objecting to the dismissal of Dr. Vargas. The letter, dated August 19, 1986, exalts the excellent qualifications of Dr. Vargas and complains that the report (Plaintiff's Exhibit 50) relied upon Dr. Nydia de Jesús to remove Dr. Vargas was not shown to either Dr. Vargas or members of the Department. A seventh professor wrote a letter to Dr. Vargas expressing his full support and dismay at his removal (Plaintiff's Exhibit 44). In total, seven of ten professors at the Department of Physiology (if you exclude Dr. Vargas) favor Dr. Vargas as Head of the Department.

At trial Dr. Sillau testified of Dr. Vargas' excellent accomplishments in the Department. Dr. Sillau noted Dr. Vargas' creation of an environment of academic excellence. He noted Dr. Vargas' recruitment of various reputed scientists, the reinitiation of seminars where students and professors met to discuss scientific research, the obtainment of a National Institute of Health grant and the creation of an atmosphere of respect.

Another unpopular decision reached by Dr. Nydia de Jesús was the transfer of Dr. Susan Stitzer back to the Department of Physiology. Eight out of eleven professors of the Department of Physiology objected to this transfer. These professors referred

to the normal conditions in which the Department presently operated and the reiterated attempts by Dr. Kent Stitzer to alter these conditions (Plaintiff's Exhibit 29).

■ In view of the above and of *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1979), and *McDonnnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), type analysis we find, as shown in our conclusions of law, that Dr. Vargas was removed as Head of the Department of Physiology for political and national origin reasons. The reasons given by Dr. Nydia de Jesús for Dr. Vargas' removal were just a pretext to remove him from his position. If she wanted effective leadership in the Department, she would not have appointed Dr. Martínez Maldonado as Acting Head of the Department. Dr. Martínez Maldonado spent two or three hours a week in the Department when he was the Department's Acting Head for seven years. He remains a full-time doctor at the Veterans Administration Hospital. Second, Dr. Martínez Maldonado was responsible for creating a havoc at the UPRMSC for his remarks at the faculty meeting of January 27, 1984. It is simply not credible that Dr. de Jesús did not know of these remarks or of the posters spread out throughout the Department. Furthermore, if she really wanted to reduce tension in the Department, she would not have appointed Dr. Susan Stitzer, a close colleague of Dr. Martínez Maldonado, back to the Department. Eight out of eleven professors of the Department objected to this appointment.

The harassment did not start with the removal of Dr. Vargas as Head of the Department. Dr. Vargas' tenure has been delayed over a year partly because of 1) Dr. Susan Stitzer's proposal to postpone consideration of Dr. Vargas' tenure upon completion of his five years as associate professor; and 2) the concern of the Administrative Board relating to the granting of tenure to professors who occupy administrative positions. As shown by the regulations and by Dr. Pedro Santiago Borrero's testimony, this was another gimmick to harass Dr. Vargas for political and national origin reasons.

### Conclusions of Law

In order to be entitled to a preliminary injunction a plaintiff must satisfy four criteria: 1) that he will suffer irreparable injury if the injunction is not granted; 2) that such injury outweighs any harm which granting the injunctive relief would inflict on the defendant; 3) that plaintiff has exhibited a likelihood of success on the merits; and 4) that the public interest will not be adversely affected by the granting of the injunction. *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981).

■ We find that these four criteria were met in this case. First, there is no doubt that plaintiff's constitutional rights have been violated. Plaintiff was harassed and removed from his position because of national origin and political reasons. With respect to the latter, plaintiff was removed not because he was an NPP member but because he did not belong to the PDP. In fact, plaintiff had no local political affiliation. This political neutrality is protected by the First Amendment [5] and as such a violation of this right even if for a brief period constitutes irreparable injury. *Libertarian Party of Indiana v. Packard*, 741 F.2d 981 (7th Cir.1984); *Johnson v. Bergland*, 586 F.2d 993 (4th Cir.1978).

---

**5.** See *Abood v. Detroit Board of Education*, 431 U.S. 209, 234–235, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1976) ("at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State"); *Elrod v. Burns*, 427 U.S. 347, 357, 96 S.Ct. 2673, 2681, 49 L.Ed.2d 547 (1975) ("patronage ... to the extent it compels or restrains belief and association, is inimical to the process which underguards our system of government and is at war with the deeper traditions of democracy embodied in the First Amendment."); *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984) ("Freedom of Association therefore plainly presupposes a freedom not to associate.").

The Court also finds that the protection of Dr. Vargas' constitutional rights outweighs any harm that could be vested upon the defendant. In fact, the reinstatement of Dr. Vargas would benefit the Department of Physiology and the University's Medical Campus. The evidence at trial demonstrated that Dr. Vargas was a well-prepared and devoted enthusiast of his position who created an environment of academic excellence (See Dr. Sillau's testimony). This contrasts with Dr. Martínez Maldonado, who would spend two or three hours a week in the Department when he was its Acting Chairman for seven years and who created a havoc in the Department with his remarks at the faculty meeting of January 27, 1984.

We are also convinced that the plaintiff has met his burden in establishing his likelihood of success on the merits. With regards to plaintiff's claim of national origin discrimination, *White v. Vithally*, 732 F.2d 1037 (1st Cir.1984), held that for a plaintiff to prove an individual claim of discriminatory treatment, whether under the Constitution or under Title VII, a plaintiff must prove purposeful discrimination. In *T. & S. Service Associated v. Crenson*, 666 F.2d 722, 724 (1st Cir.1981), the court also recognized that where direct evidence of discrimination is lacking the analytical framework for proving discriminatory treatment set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802–805, 93 S.Ct. at 1824–25, is equally applicable to constitutional and to Title VII claims.

The methodology of proof set out in *McDonnell Douglas v. Green, supra,* and in subsequent cases is the following: 1) the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination; 2) if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection; 3) should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not his true reasons but were a pretext for discrimination. *Tex-* as *Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

The *prima facie* case "raises an inference of discrimination only because we must presume that these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Corporation v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Plaintiff has clearly met that burden: 1) Dr. Martínez Maldonado blamed non-native Puerto Rican professors for the poor performance of the students; 2) after said incident, posters were put throughout the Department requesting the dismissal of non-native Puerto Ricans; 3) Dr. Bernstein, a fellow tenured professor, born and raised in Chile, was physically attacked by professor Garcia Palmieri, a member of the faculty promotions committee which delayed plaintiff's tenure decision; 4) plaintiff's request for tenure has been improperly delayed over a year partly because of Dr. Susan Stitzer, a close colleague and friend of Dr. Martínez Maldonado; 5) Dr. Nydia de Jesús and Dr. Saldaña appointed Dr. Martínez Maldonado Acting Head of the Department to supposedly provide effective leadership in the Department; and 6) Dr. Susan Stitzer was appointed back to the Department of Physiology.

Having proven a *prima facie* case of discrimination, the burden shifts to the defendants to articulate some legitimate, non-discriminatory reasons for the employee's rejection. As stated in *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096, "to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." In this case the explanation offered by Dr. Nydia de Jesús is not credible. As shown by her testimony and the appointment of Dr. Martínez Maldonado, Dr. de Jesús did not remove Dr. Vargas because she wanted to resolve the personality problems in the Department or because she wanted effective leadership to deal with

the rest of the departmental problems. We, therefore, do not find that defendants have sufficiently justified plaintiff's removal and they have certainly not justified his harassment.

Defendants' failure to adequately rebut plaintiff's *prima facie* case leads to the conclusion that Dr. Vargas was removed for national origin reasons. We reached the same conclusion for plaintiff's political discrimination claim.

■ The plaintiff has the initial burden to show that his conduct was constitutionally protected and that such conduct was a "substantial" or motivating factor in the decision to harass and remove him from his position. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576; *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979). If plaintiff fails to carry his burden of proving that a discriminatory purpose was a motivating factor in defendants' conduct, the constitutional inquiry must be ended. *Arlington Heights v. Metro Housing Corp.*, 429 U.S. 252, 270–271, 97 S.Ct. 555, 566, 50 L.Ed.2d 450 (1979).

As shown by the Findings of Fact, plaintiff met his burden and established that his political neutrality was another substantial or motivating factor in his removal and harassment. Even though there is no evidence of Dr. Nydia de Jesús' political affiliation, plaintiff showed that Dr. Martinez Maldonado and Dr. Saldaña were members of the PDP and that Dr. Saldaña was an active member. Plaintiff also showed that the reasons for his removal and delay of tenure were just a pretext to harass him.

Having plaintiff met his burden, the defendants were entitled to show by a preponderance of the evidence that Dr. Nydia de Jesús and Dr. Saldaña would have reached the same decision as to plaintiff's dismissal in the absence of protected conduct. *See, Mt. Healthy City Board of Education v. Doyle, supra.* Defendants, however, were unsuccessful. As shown by the Findings of Fact, Dr. Nydia de Jesús'

reasons for the removal of Dr. Vargas were just a pretext.

■ Where, as here, political disaffiliation is the basis for the defendants' discriminatory conduct, we must strictly scrutinize whether there is any overriding government interest of vital importance to justify this conduct. *Elrod v. Burns,* 427 U.S. 347, 362–368, 96 S.Ct. 2673, 2684–87, 49 L.Ed.2d 547 (1976). The ultimate inquiry here is whether party affiliation is an appropriate requirement for the effective performance of the public office involved. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). According to the First Circuit, in *Torres Gaztambide v. Jiménez Fuentes,* 803 F.2d 1, 6 (1st Cir. 1986):

A threshold inquiry, which derives from Branti, involves examining whether the position at issue, no matter how policy-influencing or confidential it may be, relates to 'partisan political interests ... [or] concerns.' 445 U.S. at 519, [100 S.Ct. at 1295] that is, does the position involve government decision making on issues where there is no room for political disagreement on goals or their implementation. Otherwise stated, do party goals or programs affect the direction, pace or quality of governance.

Article 7 of the bylaws of the faculty of the School of Medicine of the University of Puerto Rico (Plaintiff's Exhibit 33) provides:

b. The head of a department shall be responsible for the teaching, research, and administrative policies of his department and the supervision of its personnel. He shall be responsible to the Dean for the instrumentation of the plans, teaching programs, standards, and educational methods in the department. The head of a department shall also have the following specific functions:

1. To call and preside at departmental meetings.

2. To appoint from among the members of the department a secretary who shall keep minutes of the meetings of the department.

3. To present the majority opinion of the members of the faculty of the department on matters of policy at the meetings of the Committee on Administration.

4. To formulate and present to the Departmental Faculty the policies for appointments and promotions within the department.

5. To submit to the Dean the candidates for promotions or appointments within the department in accordance with the departmental policies. This proposal should be accompanied by an up to date curriculum vitae of the candidates.

6. He shall recommend to the Dean the candidates for appointments as chief of sections, subdivisions or training programs within his department.

7. To submit to the Dean, after consultations with the departmental faculty, the final grades, recommendations for awards, and other recommendations for medical students enrolled in courses in the department.

8. He should inform and advise students of their academic difficulties as soon as observed. He shall see that the rules and regulations established in his department for the conduct and discipline of students are effectively and fairly enforced.

9. To submit to the Dean a proposal for the annual budget of the department, after consultation with members of the department.

10. To submit to the Dean an annual report of the work of the department.

11. To appoint a departmental representative to the meetings of the Committee on Administration whenever he is unable to attend.

■ The above duties and functions, although of great importance, clearly involved politically neutral, administrative and academic matters. Although the head of a department is responsible to the dean for the teaching, research and administrative policies of the department, such responsibilities and the other responsibilities set out in the bylaws involve the implementation of educational policies that go beyond partisan political concerns. *See, Zaida Lydia de Choudens v. The Government Bank of Puerto Rico*, 801 F.2d 5 (1st Cir. 1986).

Of course, if plaintiff had no property right to protect, there would be no injury.

■ The property right question is governed by state law, *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In Puerto Rico, as established by *Báez Cancel v. Mayor of the Municipality of Guaynabo*, 100 P.R.R. 980 (1972), irregular and temporary employees have a right to be protected from political discrimination. In *Báez Cancel*, 100 P.R.R. 985–986, the court said:

> We do not agree. Section 1 of Art. 11 of the Constitution of the Commonwealth of Puerto Rico prescribes in a clear manner that "no discrimination shall be made on account of race, color ... political or religious ideas." The proscription of discrimination is clear and final. Its test does not permit any distinction. It means to say what it says. That the State in any of its multiple functions or services shall not discriminate against a citizen because of the mere fact that the latter is colored, an atheist or on account of his political ideas. Any other construction would enervate its efficacy. To strengthen it and not to weaken it is our duty, as the principal custodians of the Constitution.

> \*   \*   \*   \*   \*   \*

To limit its applications, as the trial court did, to those employees who have permanency under the Municipal Merit System is to force a distinction contrary to its true spirit and purpose. Such a construction would precisely leave the more helpless destitute of protection.

In the present case, the head of a department is appointed for an indefinite term. However, as in *Báez Cancel*, even though plaintiff does not have a property interest in his position, the state in any of its multiple functions cannot discriminate against

him for national origin or political reasons. Therefore, even though plaintiff has no property interest in the position, he is entitled to relief under 42 U.S.C. § 1983. Wherefore, based on the findings of discrimination, we are convinced that plaintiff has met his burden of establishing a likelihood of success on the merits.

With regards to the fourth criteria on the issuance of a preliminary injunction, no public interest will be adversely affected by the granting of the injunction. In fact, the public interest is preserved by protecting plaintiff's civil rights. Moreover, the reinstatement of Dr. Vargas would benefit the Department of Physiology.

WHEREFORE, in view of the above Dr. José Saldaña is hereby ORDERED to reinstate plaintiff to his previous position as Head of the Department of Physiology. IT IS FURTHER ORDERED that the defendants in this case refrain from harassing plaintiff in violation of his civil rights.

IT IS SO ORDERED.