**Fernando VARGAS–FIGUEROA,**
**Plaintiff, Appellee,**

v.

**Jose M. SALDANA, etc., et al.,**
**Defendants, Appellants.**

**No. 86–2014.**

United States Court of Appeals,
First Circuit.

Submitted June 5, 1987.
Decided Aug. 18, 1987.

Ruben T. Nigaglioni, James D. Noel, III, Ledesma, Palou & Miranda, Hato Rey, P.R., and Lady Alfonso de Cumpiano, Legal Counsel, University of Puerto Rico, San Juan, P.R., on brief, for defendants, appellants.

Eliezer Aldarondo Ortiz, Hato Rey, P.R., Miguel Pagan, San Juan, P.R., and Aldarondo & Lopez Bras, Hato Rey, P.R., on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and RE,[*] Judge.

BREYER, Circuit Judge.

In August 1986 the chancellor of the University of Puerto Rico's medical sciences campus, Dr. Jose M. Saldana, and the dean of its medical school, Dr. Nydia de Jesus, removed the plaintiff, Dr. Fernando Vargas Figueroa, from his post as head of

* Chief Judge of the United States Court of International Trade, sitting by designation.

the physiology department and replaced him with Dr. Manuel Martinez Maldonado. Dr. Vargas then sued the chancellor and the dean (and Dr. Martinez), claiming under 42 U.S.C. § 1983 that the chancellor and the dean had unlawfully removed him because of his political affiliation and national origin. After a hearing, the district court issued a preliminary injunction that required the university officials to permit Dr. Vargas to continue as head of the department. *Vargas Figueroa v. Saldana,* 646 F.Supp. 1362 (D.P.R.1986). Those officials appeal, claiming that the injunction is unlawful. We agree and now reverse.

I

The record indicates the following events:

1. Between 1973 and 1979 Dr. Martinez (plaintiff's eventual replacement) was acting head of the physiology department. 646 F.Supp. at 1364. In 1979 Dr. Martinez took sabbatical leave in Boston, and Dr. Jaime Bernstein replaced him as acting department head. (Tr. 282.) In November 1979 the evaluation committee of the department recommended against granting tenure to Dr. Susan Opava Stitzer, a native New Yorker and assistant professor of physiology who had often collaborated with Martinez. (A. 114–16, 126, 194, 208–12.) Dr. Martinez strongly supported Dr. Stitzer's tenure bid. (A. 121–25.) The then dean endorsed Dr. Stitzer for tenure, but also transferred her, over her strong objections, out of the department of physiology. (A. 134–40; Tr. 286–87.) Seven members of the physiology department—including Dr. Martinez and Dr. Kent Stitzer (Susan Stitzer's husband and a native Californian) —protested her transfer. (A. 144, 168.) The issue divided the faculty into two groups, which we shall call "pro-Stitzer (Martinez)" and "anti-Stitzer (Bernstein)."

2. The argument within the faculty about Susan Stitzer was apparently only one illustration of the acrimony and factionalization prevalent within the physiology department. A former dean characterized the department as one where "there were many problems, many quarrels, dis-

agreements among the faculty for many years. . . . [p]ersonality problems, problems of communication, communication especially agreeing on simple things. . . . [on] day to day details that sometime[s] you look at from the outside seem to you ridiculous." (Tr. 341–42.)

3. In 1980 the university hired the plaintiff, Dr. Vargas, a Chilean-born American citizen who was then teaching at the University of Minnesota. 646 F.Supp. at 1363 (Tr. 5–6.) He became both a professor in the physiology department (at a $33,000 teaching salary) and permanent department head (a position carrying an annual $7000 administrative bonus). (Tr. 11.)

4. Other events continued to polarize the faculty along "pro-Stitzer (Martinez)" and "anti-Stitzer (Bernstein)" lines, and plaintiff seems to have sided with the "anti-Stitzers." When plaintiff assumed his post, Dr. Stitzer's transfer out of the physiology department had been discussed but not yet officially recommended. The plaintiff spoke to Dr. Bernstein but not to Dr. Stitzer about her transfer, and he allowed the transfer to proceed. (A. 106.) Later, Dr. Stitzer sued the university, claiming (unsuccessfully) that her transfer was motivated by sexual bias. *See Stitzer v. University of Puerto Rico,* 617 F.Supp. 1246 (D.P.R.1985). Plaintiff testified against her (Tr. 56, 58); Dr. Martinez testified for her (Tr. 56). At some point, plaintiff removed Dr. Martinez from his post as coordinator of a chapter of renal physiology. 646 F.Supp. at 1364.

5. The "pro-Stitzer (Martinez)" group sometimes seemed openly hostile toward the plaintiff. There is testimony that, on one occasion, Dr. Martinez arranged the visit of a Maryland physiologist, together with seminars and a detailed program of activities, as if he (rather than plaintiff) were still department head. More importantly, at a January 1984 faculty meeting, Dr. Martinez blamed poor student performance on the large number of non-native Puerto Rican professors in the department. The next day someone placed on plaintiff's door a poster that said "Evidence mounting quickly [that] Non-P.R. professors [are]

Guilty[.] Ad Hoc Committee: Expel them All!'' Similar posters appeared elsewhere in the department. Dr. Bernstein (who, like plaintiff, is from Chile) complained about Dr. Martinez's remarks, and another (apparently "pro-Stitzer (Martinez)") faculty member then insulted and punched Dr. Bernstein. Some time later, Dr. Stitzer's husband complained that plaintiff, as department head, had given preference in hiring to Chileans and South Americans. Both Stitzers opposed plaintiff's tenure bid, and his tenure request has yet to be settled. 646 F.Supp. at 1364–65.

6. About one year after the election of a new governor of Puerto Rico in November 1984, defendant Saldana became chancellor of the medical sciences campus. (Tr. 77.) Another half year later, in March 1986, defendant de Jesus became dean of the medical school. The dean appointed an ad hoc committee to study the department of physiology. (Tr. 240, 247.) The committee reported that the department was "polariz[ed]," and it criticized plaintiff for his inability to "harmonize" the factions. (A. 104.)

7. As the committee recommended, the dean transferred Dr. Stitzer back into the physiology department. The plaintiff, Dr. Bernstein, and others protested the re-transfer. 646 F.Supp. at 1367 (A. 112, 145). The dean also recommended to the chancellor that he replace plaintiff as department head. In August 1986 the chancellor did so, making Dr. Martinez acting department head. 646 F.Supp. at 1363–64, 1366. The plaintiff has kept his position as associate professor of physiology; his university salary has dropped from $40,000 to $33,000. Plaintiff brought this suit to recover his position as department head. The district court granted a preliminary injunction reinstating him, and defendants now appeal.

## II

This court has said that a plaintiff seeking a preliminary injunction must meet four criteria:

"The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction."

*Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981) (quoting *Women's Community Health Center v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979)). The heart of this test is the second and third steps, which present the question whether the harm caused plaintiff without the injunction, *in light of* the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants. *See Massachusetts v. Watt,* 716 F.2d 946, 953 (1st Cir.1983); *cf. SEC v. World Radio Mission,* 544 F.2d 535, 541 (1st Cir.1976) ("To the extent that a defendant can show harm, this must be discounted by the degree that a plaintiff can show likelihood of success."). While recognizing the district court's authority initially both to find and to weigh the facts, *see Brown v. Chote,* 411 U.S. 452, 457, 93 S.Ct. 1732, 1735, 36 L.Ed.2d 420 (1973), we nonetheless find that the record does not support the injunction.

We note first that it is difficult to identify an "irreparable injury" to Dr. Vargas if the injunction is denied but he goes on to win the case. Dr. Vargas's position as department head accounted for only $7000 of his $40,000 annual income, the remainder of which he will continue to draw as an associate professor. If he eventually wins this suit, he can collect his $7000 annual bonus as back pay from the university.

At the same time, requiring the university to keep Dr. Vargas in office while the lawsuit continues imposes a serious burden upon the university, namely the burden of running a department without the department head of its choice. The injunction surrenders the university's academic autonomy to a federal district court. Courts have wisely recognized the importance of allowing universities to run their own affairs (and to make their own mistakes). To do otherwise threatens the diversity of

thought, speech, teaching, and research both within and among universities upon which free academic life depends. *Cf. Board of Curators v. Horowitz*, 435 U.S. 78, 87–91, 98 S.Ct. 948, 953–55, 55 L.Ed.2d 124 (1978) (counseling discretion in judicial interference in academic decisionmaking); *Kumar v. Board of Trustees*, 774 F.2d 1, 10–11 (1st Cir.1985) (recognizing the "right" of university authorities to define the standards that faculty members must meet). Should the university eventually win this case, it cannot recover compensation for the loss of freedom to conduct its affairs while the injunction was in effect. The district court concluded that the injunction could not harm the university because, after hearing witnesses, the court decided that Dr. Vargas would make a better department head than Dr. Martinez, his replacement. But, the harm to the university does not lie in the department's loss of the services of a particular individual; rather, it lies in the court's taking from the university the opportunity to make that decision itself.

■ We do not believe that plaintiff's probability of success on the merits can overcome the balance of harms. The evidentiary support for the district court's preliminary conclusion that the dean or chancellor dismissed plaintiff because of his political affiliation is weak. Plaintiff is not affiliated with any political party; he claims he was fired because he is *not* a member of the PDP. The dean testified, without contradiction, that she too is not a PDP member and that she did not know plaintiff's party affiliation. (Tr. 263–64.) The record contains no evidence that the dean or chancellor has demoted or dismissed any other politically nonaffiliated employee. The record simply shows that the chancellor and Dr. Martinez are PDP members and that the PDP won the 1984 election. 646 F.Supp. at 1363–64. The district court pointed to the dean's testimony that she replaced plaintiff with Dr. Martinez because she thought Martinez was the better man; the court said that testimony was incredible and obviously pretextual. 646 F.Supp. at 1369–70. But, in the context of the record, if the dean's discussion of the merits was a "pretext," it seems likely to have been a pretext to hide *faculty* politics (i.e., taking sides in an intradepartmental factional dispute). To win, plaintiff must show not just a "pretext," but (on the plaintiff's theory) a pretext that hides dismissal because he did not belong to the PDP.

■ The evidence that plaintiff's non-Puerto Rican national origin led the dean and chancellor to replace him seems similarly weak. The district court based its finding that plaintiff would likely succeed in his national origin discrimination claim on the following six facts:

1) Dr. Martinez Maldonado blamed non-native Puerto Rican professors for the poor performance of the students; 2) after said incident, posters were put [up] throughout the Department requesting the dismissal of non-native Puerto Ricans; 3) Dr. Bernstein, a fellow tenured professor, born and raised in Chile, was physically attacked by professor Garcia Palmieri, a member of the faculty promotions committee which delayed plaintiff's tenure decision; 4) plaintiff's request for tenure has been improperly delayed over a year partly because of Dr. Susan Stitzer, a close colleague and friend of Dr. Martinez Maldonado; 5) Dr. Nydia de Jesus and Dr. Saldana appointed Dr. Martinez Maldonado Acting Head of the Department to supposedly provide effective leadership in the Department; and 6) Dr. Susan Stitzer was appointed back to the Department of Physiology. 646 F.Supp. at 1369. The first three of these facts relate to the hostile actions taken against non-Puerto Rican professors in early 1984. The dean testified, again without contradiction, that she did not know of these events (Tr. 262), and there is no evidence that the chancellor knew of them. The dean and chancellor replaced plaintiff more than two and one-half years after these events took place. And, they replaced him with a person sympathetic to the Stitzers, who were also born outside Puerto Rico. The last three facts listed by the district court relate not to national origin discrimination, but to intradepartmen-

tal factions and polarization, of which the record is replete with evidence. A factfinder might disbelieve the dean's disclaimer of knowledge of the January 1984 incidents. But still we are uncertain at this stage that the record contains sufficient evidence legally to permit a finding that national origin prejudice, rather than simple departmental rivalry or university politics, led to plaintiff's dismissal. *See White v. Vathally*, 732 F.2d 1037, 1042 (1st Cir.1984) (holding that the plaintiff retains " 'the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination' " (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981))).

We do not, of course, decide the merits. We determine only that, given plaintiff's failure to have established a more substantial probability of prevailing on the merits, the harm caused him by denying a preliminary injunction does not outweigh the harm caused the university by granting it. The district court ought not to have issued the injunction. Its decision is

*Reversed.*