Nedder v. Rivier College                 CV-95-116-SD  08/14/95 P

UNITED STATES DISTRICT COURT FOR THE

                         DISTRICT OF NEW HAMPSHIRE


<u>Mary Nedder</u>

        v.                                    Civil No. 95-116-SD


<u>Rivier College</u>



                               O R D E R


        Plaintiff Mary Nedder brings this civil action against

Rivier College, alleging that Rivier's termination of her

employment as an Assistant Professor of Religious Studies

violated Title I of the Americans with Disabilities Act (ADA),

Pub. Law No. 101-336, 104 Stat. 327 (1990) (codified at 42 U.S.C.

§§ 12101-12117 (Supp. 1995).  Plaintiff also asserts claims under

New Hampshire law for breach of contract, wrongful discharge, and

violation of New Hampshire Revised Statutes Annotated (RSA) 354-

A, the New Hampshire "Law Against Discrimination".

        Presently before the court is plaintiff's motion for a

preliminary injunction, in which plaintiff requests reinstatement

to her former position as an Assistant Professor of Religious

Studies pending final resolution of her action on the merits.

Defendant objects.

An evidentiary hearing on plaintiff's motion was held on July 20, 1995, and July 25, 1995. At said hearing, each party submitted documentary evidence regarding plaintiff's employment history at Rivier, and the following individuals testified: plaintiff Mary Nedder; Dr. Leo R. Sandy, Professor of Education at Rivier; Father Gerald T. Murphy, Professor of Religious Studies and the Chair of Rivier's Religious Studies Department; Sister Jeanne Perreault, President of Rivier; Brother Paul Demers, Rivier's Chaplain, Campus Minister, and a part-time teacher in the Religious Studies Department; Camille MacKnight, Rivier's payroll and benefits coordinator; Patrice O'Donnell, Associate Professor of Psychology and the Chair of Rivier's Behavioral Sciences Department; Valerie Richard, an employee in Rivier's housekeeping and food services departments; Dr. Jacqueline Landry, Rivier's Vice President of Academic Affairs; and Dr. Judith Haywood, Dean of Rivier's School of Nursing. In addition, at the close of the hearing the court received plaintiff's request for ruling, defendant's requests for findings of fact and rulings of law, and defendant's supplemental memorandum in support of its objection to plaintiff's preliminary injunction motion.

<u>Background</u>

In 1988 Mary Nedder applied for part-time faculty position at Rivier College after learning of the open position from Father Gerald T. Murphy, a member of Rivier's faculty whom Ms. Nedder had met while she was teaching at St. Basil's Seminary in Methuen, Massachusetts.[1]

Father Murphy encouraged Ms. Nedder to apply to Rivier College and recommended that she be hired to teach courses on a part-time basis in the school's Department of Religious Studies. Ms. Nedder was subsequently interviewed for the part-time position by the Chair of the Religious Studies Department, Sister Louise Tessier, and on March 15, 1988, Sister Louise recommended that Ms. Nedder be hired to teach a course entitled "Values,

---

[1]Prior to this time, Ms. Nedder was employed as the office manager for James J. Tenn, M.D., in Manchester, New Hampshire. She had also served as a Professor of Catechetics for St. Basil's Seminary and as a staff member at the Salvatorian Center in Methuen, Massachusetts, and had taught various religious education courses and workshops through the Christian Life Center--Diocese of Manchester and Melkite Diocese of Newton. Defendant's Exhibit A.

Ms. Nedder received a Bachelor of Arts degree in Theology and Education from Notre Dame College in 1970 and a Master of Arts degree in Religious Education from Fordham University in 1972. At the time of her original application to Rivier, Ms. Nedder also indicated on her resume that she was a student at Boston University's School of Theology, where she was enrolled in a Master of Divinity degree program that would lead to a Doctor of Ministry degree. <u>Id.</u>

3

Christianity and Modern Society" during one of the school's summer sessions. Defendant's Exhibit A. On April 6, 1988, Ms. Nedder's application for part-time employment was approved by Rivier's Vice President of Academic Affairs, Dr. Jacqueline Landry. Id.

Ms. Nedder continued to teach courses in the Religious Studies Department on a part-time basis through the spring of 1992 when a full-time teaching position became available. Ms. Nedder's application to fill that faculty position was supported in part by a letter of recommendation from Father Murphy to Dr. Landry, in which Father Murphy wrote,

> For the past five years, Mary has taught a
> wide range of courses within the department.
> Her most recent course offerings include
> Comparative Religions and Bioethics. Student
> evaluations of her performance as a classroom
> teacher have been consistently excellent.
> Many students have indicated that her classes
> have been a turning point in their religious
> journey at Rivier.

Plaintiff's Exhibit 3; Defendant's Exhibit C. Murphy further wrote,

> I have reviewed all of her class syllabi and
> the student evaluations of the courses which
> she has taught at Rivier. I find Mary to be
> very competent both in her academic grasp of
> the material offered and in her use of
> teaching methods which produce her planned
> objectives.

4

> . . . It should also be noted that Ms.
> Nedder has credentials in teaching the
> methodology of religious education which has
> been an area of both discussion and planning
> for the department for several years.

Id.

In a letter dated June 12, 1992, Sister Louise informed Dr. Landry that the faculty Search Committee[2] had determined that of the ten applicants for the full-time professor of Religious Studies position, Ms. Nedder was the best qualified. Defendant's Exhibit D. Among the considerations listed in support of the committee's decision were Ms. Nedder's prior performance at Rivier, her other teaching experience from 1972 to 1992, and the fact that Ms. Nedder had begun her doctoral work. Id. Sister Louise further indicated that

> [b]esides these considerations, the Committee
> was informed that Mary's Master's degree from
> Fordham (M.A.) prepared her as a specialist
> in methodology in Religious Studies. She
> would be a great asset for the Department and
> the College if we considered offering courses
> to prepare catechists or to have an
> interdisciplinary course in Education and
> Religious Studies for future religion
> teachers.

Id.

---

[2]Testimony at the preliminary injunction hearing revealed that the search committee included Sister Louise, Father Murphy, and Dr. Leo Sandy.

On June 16, 1992, Ms. Nedder was appointed as Assistant Professor of Religious Studies for the 1992-93 academic year by the President of Rivier College, Sister Jeanne Perreault. Plaintiff's Exhibit 16; Defendant's Exhibit E.  The courses taught by Ms. Nedder during the 1992-93 academic year included: The Epistles, Comparative Religions, Bioethics, Challenge of Peace, Christian Faith, Introduction to the Bible, Prayer and The True Self, and Nursing Ethics.  Plaintiff's Exhibit 20.

On May 5, 1993, Sister Louise, as Chair of the Religious Studies Department, "highly and wholeheartedly" recommended that Ms. Nedder be reappointed as a full-time faculty member for the 1993-94 academic year.  Plaintiff's Exhibit 19; Defendant's Exhibit F.  Sister Louise's positive evaluation of Ms. Nedder's performance during the 1992-93 academic year concludes with the following comments:

> She [Mary Nedder] has proven to be a very valuable professor.  Her colleagues have come to respect her intellectual depth and her loving and respectful way of relating to each person.  She identifies very well with Rivier and is completely dedicated to the Catholic mission of the College.  Mary is an asset--a gift to Rivier and has a positive influence on her colleagues and students.

Id.

On May 25, 1993, Sister Jeanne reappointed Ms. Nedder as Assistant Professor of Religious Studies for the 1993-94 academic year. Plaintiff's Exhibit 17. During that year, Ms. Nedder again taught Prayer and the True Self, Challenge of Peace, and Comparative Religions. Plaintiff's Exhibit 20. She also taught courses entitled "On Being Human" and "Women and Spirit". Id.

On March 9, 1994, Father Murphy, having replaced Sister Louise as Chairperson of the Religious Studies Department, evaluated Ms. Nedder's performance for the 1993-94 academic year and recommended that she be reappointed for the 1994-95 academic year. Plaintiff's Exhibit 4; Defendant's Exhibit G. Father Murphy's recommendation was based in part on Ms. Nedder's "demonstrated success in the classroom and her valuable contributions to the college community." Id.

Father Murphy also states in his recommendations, however, that during the conference he had with Ms. Nedder "[s]ome teaching and learning-community issues were raised that will be reviewed on a regular basis." Id. Father Murphy testified at the preliminary injunction hearing that these "issues" included an evaluation of Ms. Nedder's teaching effectiveness based on (1) feedback Father Murphy had received from independent sources on campus, (2) student evaluations of Ms. Nedder's work, and (3)

7

Father Murphy's own evaluation of the content of Ms. Nedder's course offerings. Father Murphy further testified that he met with Ms. Nedder during the first semester of the 1993-94 academic year to discuss complaints from other faculty members about her body odor and use of strong perfumes.[3] Father Murphy stated that Ms. Nedder explained to him that the body odor problem she was experiencing was due to a gynecological problem. These problems were subsequently resolved by Ms. Nedder.

On May 16, 1994, Ms. Nedder was reappointed as Assistant Professor of Religious Studies for the 1994-95 academic year. Plaintiff's Exhibit 18. The following month, on June 30, 1994, Father Murphy met with Ms. Nedder to discuss student reactions to her courses. This meeting was prompted by reports from academic advisors in the School of Undergraduate Studies and the School of Nursing that students were unwilling to enroll in Ms. Nedder's courses.

In response to the advisors' reports that students were complaining that Ms. Nedder was too "dogmatic" and "inflexible",

_____

[3]Ms. Nedder testified at the hearing that the statement about "learning and community issues" in Father Murphy's recommendation referred to his concerns about her body odor problem and use of strong perfumes and about Ms. Nedder's pursuit of her doctoral degree.

Ms. Nedder testified that she asked Father Murphy if she could speak with the advisors, but Murphy told her "that this thing will probably blow away anyway and don't make much of it and don't bother because it wasn't necessary." However, Ms. Nedder further testified that Father Murphy did indicate at this meeting that Rivier would "look hard" at renewing her contract if the advisors' concerns were not resolved. This testimony is consistent with Father Murphy's memorialization of the meeting in a memorandum to Dr. Landry which contains the following language: "student issues of such significance as to effect negatively decision to offer teaching contract (rehire) for 1995-96 academic year." Plaintiff's Exhibit 6; Defendant's Exhibit J.

At the June 30 meeting, Father Murphy and Ms. Nedder also discussed student evaluations from the course entitled "On Being Human" which Ms. Nedder had taught during the previous semester. Father Murphy indicated to her that the evaluations contained negative remarks, but Ms. Nedder testified that she did not receive Father Murphy's written compilation of the evaluations, Plaintiff's Exhibit 7, until July 11, and did not receive copies of the actual student evaluations until a later date.

In a memorandum dated August 12, 1994, Father Murphy recommended to Dr. Landry that Ms. Nedder not be rehired.

9

Plaintiff's Exhibit 5.  Murphy indicates in this memo that the negative feedback received from the academic advisors, from student evaluations and from "our perceptions", led to a reexamination of Ms. Nedder's status.  Upon reexamination, Father Murphy concluded that Ms. Nedder did not have adequate academic preparation to fill the department's need for a generalist.  Id. at 2.  Murphy further indicated that Ms. Nedder's plans for obtaining her Th.D. from Boston University would not, in his opinion, provide her with the academic preparation needed to teach theology at a Catholic college.  Murphy also lists the following "general impressions" about Ms. Nedder:

> a.) too absorbed with personal problems.
> b.) scapegoats negative feedback.  States that others neglect her.
> c.) unable to use office when snow on the ground.
> d.) couldn't participate fully in academic convocation
> e.) couldn't participate in commencement procession. (claims emotional crisis when in a crowd.)
> f.) inappropriate use of faculty secretary without checking with chair.  Called faculty meeting without notifying chair. (see memo's).
> g.) necessitated conference re: personal hygiene at request of other department member.
> h.) cautioned repeatedly about inappropriate use of time e.g. campus ministry retreat work when course work required work.

10

Id. at 3.

In early August, Ms. Nedder met with Dr. Landry to discuss the concerns Father Murphy had raised about her competency to teach certain classes and about her advanced degree program. Father Murphy subsequently telephoned Ms. Nedder and informed her that because Rivier had decided not to pursue the Religious Education program and because Ms. Nedder was not pursuing a terminal degree that would assist her in meeting his needs for a generalist, her contract would not be renewed.[4]

By letter dated August 19, 1994, Ms. Nedder received written confirmation that Rivier would be "unable to renew" her teaching contract after her current contract for the 1994-95 academic year expired. Plaintiff's Exhibit 10; Defendant's Exhibit L. The explanation given in the letter for this decision was Rivier's decision not to pursue a Religious Education program and its determination that the department needed a generalist, whereas Ms. Nedder's academic preparation and area of expertise were in the field of religious education. Id.

---

[4]The evidence before the court reveals that the establishment of a Religious Education program geared toward educating laypersons in the area of pastoral ministry has been a goal of Rivier's Department of Religious Studies since at least 1988. Mary Nedder played an integral role in the development of this program while employed at Rivier.

Ms. Nedder attempted to grieve the school's decision not to renew her contract pursuant to the grievance procedures outlined in the Rivier College Faculty Handbook. However, Dr. Landry, citing sections 3.3.1, 3.5.1, and 3.5.3 of the handbook, determined that Ms. Nedder was not entitled to grieve the decision because she was still in the first three years of employment as a full-time faculty member. Plaintiff's Exhibit 21; Defendant's Exhibit DD.

In the letter denying Ms. Nedder's request to grieve the nonrenewal, Dr. Landry also informed her of the College's decision to release her from any obligation to teach courses during the 1995 spring semester. Id. Dr. Landry testified that this decision was driven by the polarization on campus between people who trusted the administration's decision not to renew Ms. Nedder's contract and people who supported Ms. Nedder.

The instant action was filed by Ms. Nedder on March 6, 1995. Ms. Nedder asserts in this action that she is disabled due to her morbid obesity, which affects her ability to ambulate. Ms. Nedder, who is 5'6" tall and currently weighs 380 pounds,

12

contends she was terminated from Rivier College because of her weight in violation of the ADA.[5]

## Discussion

### 1. Preliminary Injunction Standard

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." CMM Cable Rep., Inc. v. Ocean Coast Properties, 48 F.3d 618, 620 (1st Cir. 1995) (citing Chalk v. United States Dist. Court, 840 F.2d 701, 704 (9th Cir. 1988); American Hosp. Ass'n v. Harris, 625 F.2d 1328, 1330 (7th Cir. 1980)). "The court's interim injunctive decree attempts to prevent further injury by maintaining the status quo, thus enhancing the court's ability, if it ultimately finds for the movant, to minimize the harmful effects of the defendant's wrongful conduct." Id. (citation omitted).

> Black letter law in this circuit instructs that district courts ordinarily are to determine the appropriateness of granting or denying a preliminary injunction on the basis of a four-part test that takes into account

_____

[5]The focus of the motion for a preliminary injunction sub judice is plaintiff's ADA claim. The court therefore limits its discussion herein solely to that claim.

13

> (1) the movant's likelihood of success on the merits, (2) the potential for irreparable injury, (3) a balancing of the relevant equities, and (4) the effect on the public interest.

Sunshine Dev., Inc. v. FDIC, 33 F.3d 106, 110 (1st Cir. 1994) (citing Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991); Aoude v. Mobil Oil Corp., 862 F.2d 890, 892 (1st Cir. 1988)); see also Campbell Soup Co. v. Giles, 47 F.3d 467, 470 (1st Cir. 1995). However, the "*sine qua non*" of the preliminary injunction test is whether the movant is likely to succeed on the merits. Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993); see also Lancor v. Lebanon Hous. Auth., 760 F.2d 361, 362 (1st Cir. 1985) ("Of these four factors, the probability-of-success component in the past has been regarded by us as critical in determining the propriety of injunctive relief.").

2.  Plaintiff's Likelihood of Success on the Merits

In an employment discrimination claim brought under Title I of the ADA, the court's evaluation of plaintiff's evidence follows the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). E.g., Braverman v. Penobscot Shoe Co., 859 F. Supp. 596, 603 (D. Me. 1994).

14

Applying this framework, the court must first consider whether plaintiff can meet her initial burden of establishing a prima facie case of discrimination. Udo v. Tomes, 54 F.3d 9, 12 (1st Cir. 1995). If plaintiff can establish the requisite prima facie case, the burden of production shifts to the defendant, who must then articulate a legitimate, nondiscriminatory reason for plaintiff's termination. Id. Once the employer's burden has been met, "the plaintiff must introduce sufficient evidence to support two findings: (1) that the employer's articulated reason for laying off the plaintiff is a pretext, and (2) that the true reason is discriminatory." Id. at 13.

a. The Prima Facie Case

In order to make out a prima facie case of employment discrimination under the ADA, plaintiff must show that: (1) she was "disabled" as that term is defined by the ADA; (2) she was qualified, with or without accommodation, to do her job as an assistant professor of religious studies; (3) she was discharged; and (4) she was replaced by a non-disabled person. Sherman v. Optical Imaging Sys., Inc., 843 F. Supp. 1168, 1181 (E.D. Mich. 1994). As the First Circuit has recently held, "[i]n handicap discrimination cases brought pursuant to federal law, the

claimant bears the burden of proving each element of her chain." Cook v. Dep't of Mental Health, Retardation, and Hosps., 10 F.3d 17, 22 (1st Cir. 1993) (citations omitted).

The ADA "prohibits discrimination 'against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 725 (5th Cir. 1995) (quoting 42 U.S.C. § 12112(a)) (footnote omitted). "Disability" under the ADA

> means, with respect to an individual--
>   (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;[6]
>   (B) a record of such an impairment; or
>   (C) being regarded as having such an impairment.

---

[6]Neither "substantially limits" nor "major life activities" finds its definition in the statute; however, the EEOC has promulgated regulations which lend some interpretive guidance. See 29 C.F.R. §§ 1630.2(i), (j)(1) (1994); see also 29 C.F.R. § 1630, Appendix to Part 1630--Interpretive Guidance on Title I of the Americans with Disabilities Act.

42 U.S.C. § 12102(2).[7]  As is clear from subsection (A), "[a] physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA.  The statute requires an impairment that substantially limits one or more of the major life activities."  Dutcher, supra, 53 F.3d at 726.

### (1)  Plaintiff's Claim of Disability

In order to prevail on her ADA claim, Ms. Nedder "must meet the threshold burden of establishing that [she] is 'disabled' within the meaning of the statute[]."  Roth v. Lutheran Gen. Hosp., 57 F.3d 1446, ___, No. 94-2382, 1995 WL 377688, at *7 (7th Cir. June 27, 1995).  Such "inquiry is an individualized one, and must be determined on a case-by-case basis."  Id. (citing Byrne

---

[7]Since the definition of "disability" is substantially equivalent under both the ADA and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-797 (1988 & Supp. 1995), the court will look to the case law from both in analyzing plaintiff's disability status.  See Dutcher, supra, 53 F.3d at 725 n.4, 14; Hamm v. Runyon, 51 F.3d 721, 725 (7th Cir. 1995); Bolton v. Scrivner, Inc., 36 F.3d 939, 943 (10th Cir. 1994) ("The legislative history of the ADA indicates that 'Congress intended that the relevant caselaw developed under the Rehabilitation Act be generally applicable to the term "disability" as used in the ADA'") (quoting 29 C.F.R. pt. 1630 App. § 1630.2(g) (citing legislative history)), cert. denied, ___ U.S. ___, 115 S. Ct. 1104 (1995); Smaw v. Virginia Dep't of State Police, 862 F. Supp. 1469, 1474 (E.D. Va. 1994) ("The emergence of the ADA does not create a new avenue for claims in the area of disability discrimination; rather, the ADA incorporates the existing language and standards of the Rehabilitation Act in this area.").

17

v. Board of Educ., 979 F.2d 560, 564 (7th Cir. 1992); Forrisi v. Bowen, 794 F.2d 931, 933 (4th Cir. 1986)); see also Smaw, supra, note 7, 862 F. Supp. at 1472 ("'The definitional task cannot be accomplished merely through abstract lists and categories of impairments.'") (quoting Forrisi, supra, 794 F.2d at 933).

### (i) "Impairments" and "Major Life Activities"

As regards the matter sub judice, the court assumes arguendo that Ms. Nedder's morbid obesity constitutes an "impairment" under the ADA, cf. Cook, supra, 10 F.3d at 22-23,[8] and acknowledges that walking falls within the category of "major

---

[8]Cook is instructive, yet not dispositive, on the issue of morbid obesity as an "impairment", due to the nature of appellate review in that case as well as its underlying merits. With regard to the merits, the plaintiff in Cook was denied a position due to a "perceived disability"; namely, "that Cook's morbid obesity compromised her ability to evacuate patients in case of an emergency and put her at greater risk of developing serious ailments . . . ." Cook, supra, 10 F.3d at 21. Ms. Nedder's argument here is not so easily categorized, focusing not so much on a "perception" on the part of Rivier that she is disabled, see infra note 15 (finding no evidence that plaintiff has "regarded as" an individual with a disability), but rather on an asserted "reality" that she is, in fact, "disabled" as defined by the ADA. Moreover, the Cook court merely affirmed the jury's finding of morbid obesity as an "impairment", especially in light of the expert testimony presented "that [Cook's] morbid obesity is a physiological disorder involving a dysfunction of both the metabolic system and the neurological appetite-suppressing signal system . . . ." Id. at 23. No such expert testimony was presented by Ms. Nedder during her two-day preliminary injunction hearing.

life activities" as defined by the EEOC regulations, see 29 C.F.R. § 1630.2(i) ("Major life activities means functions such as . . . walking . . . ."). Accordingly, the remaining analysis focuses upon whether plaintiff's impairment "substantially limits" her ability to walk.[9]

### (ii) Is Plaintiff's Impairment "Substantial"?[10]

"The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." 29 C.F.R. pt. 1630 App., § 1630.2(j). To that end, "not every impairment that

---

[9]The EEOC regulations require the court to first inquire whether plaintiff's impairment substantially limits a major life activity other than working. Failing this, the court is next required to determine whether plaintiff is substantially limited in working. See, e.g., 29 C.F.R. pt. 1630 App., § 1630.2(j) ("If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered. If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working.").

[10]Before beginning its analysis, the court notes that case law on the issue of what constitutes a substantial limitation on a person's ability to walk is sparse at best. Accord Hamm, supra note 7, 51 F.3d at 724 n.3 (noting "that there is a lack of . . . cases defining a substantial limitation on a person's ability to walk").

affected an individual's major life activities is a substantially limiting impairment." Roth, supra, 57 F.3d at ___, 1995 WL 377688, at *7 (citing Hamm, supra note 7, 51 F.3d at 726 ("'Many impairments do not impact an individual's life to the degree that they constitute disabling impairments.'" (quoting 29 C.F.R. pt. 1630 App., § 1630.2 (j)))) (footnote omitted).

"The key is the extent to which the impairment restricts a major life activity; the impairment must be a significant one." Roth, supra, 57 F.3d at ___, 1995 WL 377688, at *7 (citing EEOC Compliance Manual § 902.4 (March 1995)) (other citation omitted); see also Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 933 (7th Cir. 1995) ("The ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face.") (citing 42 U.S.C. § 12101(a)).

In very general terms, the regulations indicate that "[t]he term 'substantially limits' means that the individual is either unable to perform, or significantly restricted as to the condition, manner or duration under which the individual can perform, a major life activity as compared to an average person in the general population." Roth, supra, 57 F.3d at ___ n.12, 1995 WL 377688, at *7 n.12 (citing 29 C.F.R. § 1630.2(j)(1)(ii)). More specifically, "[w]hether an impairment substantially limits

a major life activity is determined in light of (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent or long-term impact."  Dutcher, supra, 53 F.3d at 726 (footnotes omitted); accord Cook, supra, 10 F.3d at 24 (finding mutable and voluntary conditions "relevant only in determining whether a condition has a substantially limiting effect").

Cases that have addressed both obesity and walking, either separately or together, have reached the following conclusions: (1) obesity alone does not constitute a disabling impairment as defined under the ADA and (2) the inability to walk at a brisk pace for extended periods does not constitute a significant limitation on the major life activity of walking.  See, e.g., Torcasio v. Murray, 57 F.3d 1340, ___, No. 94-7206, 1995 WL 384035, at *12 (4th Cir. June 29, 1995) (reviewing recent case law finding obesity not a disability under the ADA); Smaw, supra note 7, 862 F. Supp. at 1475 ("The case law and the regulations both point unrelentingly to the conclusion that a claim based on obesity is not likely to succeed under the ADA."); Stone v. Entergy Servs., Inc., Civ. A. No. 94-2669, 1995 WL 368473, at *4 (E.D. La. June 20, 1995) ("Although plaintiff cannot walk briskly, and has some trouble climbing stairs," plaintiff's

21

"ability to walk is not substantially limited nor significantly restricted . . . ."); 29 C.F.R. pt. 1630 App., § 1630.2 (j) ("except in rare circumstances, obesity is not considered a disabling impairment"); but cf. Cook, supra, 10 F.3d at 23-26 (affirming jury determination that particular obese plaintiff qualified as a disabled individual under the Rehabilitation Act).

Stone provides a useful analogy in determining whether Ms. Nedder's walking limitation rises to the requisite level and thus attains "disability" status. Stone involved a plaintiff who suffered from such post-polio residuals as "muscle weakness, partial paralysis, one leg [being] longer than the other and one foot [being] longer than the other." Stone, supra, 1995 WL 368473, at *3. When asked at his deposition concerning his present limitations, Stone testified:

> A: I have limited endurance. If I'm climbing stairs, I have to stop after about two flights and rest. I'm unable to run, which means there are a number of sports that I can't participate in. I have limited motion in my body. When I go to bend over, I try to make sure that I either bend from the knees or support myself by holding on to a window sill, piece of furniture, something like that. If I'm walking in a group, if the group does not pace itself to me, I am left far behind. Certain activities I know I'm limited, so I try not to put myself in a position where balance would be a particular problem. Walking down stairs, my right foot won't really support me. I can't lift my

22

right heel off the ground, so in handling stairs, I have to be careful to put my whole foot on the stair when I'm going up; otherwise I've got a problem.

Q: We talked about your limited endurance, you get winded after about two flights of stairs. You have trouble handling stairs in general because of your right foot?

A: That's correct.

Q: You have limited body motion which results in your needing to bend from the knees or have a support?

A: Yes.

Q: And you need to pace yourself slower than the average person when you're walking?

A: Significantly.

Q: And you do have some trouble with balance?

A: Occasionally.

Q: Not all the time?

A: Not all the time.

Q: Other than these problems, is there any other way you differ from the average person because of your polio residuals?

A: I already told you I can't do a situp. That's about it.

Id. (emphasis added) (citation omitted). Despite the presence of such limitations, the court concluded that plaintiff did "not have a physical impairment that substantially limits a major life activity." Stone, supra, 1995 WL 368473, at *4.[11]

Ms. Nedder asserts that her morbid obesity has substantially limited her ability to walk. As evidence thereof, Ms. Nedder

_____

[11]The court also found "highly relevant to the determination of whether plaintiff is disabled" the fact that Stone did not require any devices to assist in walking. Stone, supra, 1995 WL 368473, at *3.

23

points to two separate instances--academic convocation and commencement--where her alleged walking limitation either caused her to refrain from participating altogether or curtailed the extent of her active participation.[12]

At the injunction hearing, when asked by her attorney about the academic convocation processional "incident", Ms. Nedder explained,

> A. . . . I pulled out because I couldn't keep up with the pace. It was also a hot day and I was--I was like a real big gap between me and everybody in front and people were ganging up behind me and I got nervous[13] and I was holding everybody up and I pulled out.
> Q. And could you have done it? Could you have walked faster physically?

---

[12]The court further notes that the evidence includes a one-sentence letter from Ms. Nedder's physician dated May 4, 1994, which provides, "Please excuse Mary Nedder in participating in the graduation procession due to health reasons." Letter of Renee Jacobs, M.D. Plaintiff's Exhibit 22. Ms. Nedder testified that said "health reasons" are her "disability in terms of walking."

[13]Ms. Nedder obliquely indicated during her testimony that she "was experiencing difficulty in crowds," which she sought to remedy by being put "on an end [of the processional] so that if I need[ed] to get up and leave I could . . . ." A more elaborate explanation of said "difficulty" was relayed by Father Murphy, who testified: "[Ms. Nedder] told me that she was having emotional problems with flashbacks and that she felt claustrophobic and panicky in crowds." In the absence of any expert testimony in this regard, the court limits its analysis to the physical, rather than the psychological, effects of Ms. Nedder's alleged walking disability.

24

A.  No.  I was pushing as fast as I could at that point.

Ms. Nedder testified in a somewhat similar vein regarding her actions during the commencement exercises:

Q.  So that in terms of the commencement, what were you able to do and what did you not do?
A.  I did the stuff that was on campus in the morning and went to the morning mass, had lunch, talked to students.  I went over to the campus where graduation was to be, but I didn't stay through the whole thing because it was just too much walking even that distance just from my car to where everybody was.

Professor Sandy was likewise questioned by plaintiff's counsel about Ms. Nedder's alleged walking limitation.

Q.  Did you have occasion in your observations to observe how her weight affected her ambulation?
.  .  .  .
A.  She certainly walks slower than I do, but I remember on one occasion we went--we took our class to Boston . . . to see a speaker and we had to park quite a bit, a distance away, and it was a very hot, humid night.  The air conditioner in the van didn't work, and Mary walked several blocks . . . and I was quite surprised that she was able to do that because of her situation, so if she was able to do that I don't see where that would be a major handicap in other situations.

Upon close examination of plaintiff's testimony as it relates to her alleged weight-induced walking limitation, in

25

conjunction with the pointed testimony of both Father Murphy and Dr. Sandy regarding same, as well as the EEOC regulations and current ADA case law, the court finds plaintiff's ability to walk is not "substantially limited" in either the character or the degree required to invoke the protection afforded by the ADA.

### (2) Substantial Limitation in Working

The regulations next require the court to inquire whether plaintiff's impairment substantially limits her ability to perform the major life activity of working, which, like the prior determination, "must also be made on a case by case basis." See 29 C.F.R. pt. 1630 App., § 1630.2(j). On this issue, plaintiff's injunction hearing testimony compels the court to find that her alleged impairment does not "substantially limit" her ability to work.

Under cross-examination, plaintiff and defense counsel engaged in the following colloquy:

> Q: Prior to your employment at Rivier College part-time, was weight ever an issue for you in your employment?
> A. No.
> Q. Did your weight ever interfere with you[r] being able to carry out your job?

26

A. I always had to make accommodation but once I made the accommodation I could do my job.[14]

Q. You were always able to do your job.

A. Generally.

Q. And you were able to do all the duties of your job at Rivier College without any requested accommodation at the college?

A. Other than the walking in the processions, yes.

Q. And everything you asked for they allowed didn't they?

A. That's correct.

In fact, Ms. Nedder pointedly testified that "[m]y disability does not impact my teaching."

Under inquiry from the court, Ms. Nedder further testified that her impairment neither interfered with her ability to commute between the north end of Manchester, where her home is situated, and Saint Basil's Seminary in Methuen, Massachusetts, nor Rivier College in Nashua. Ms. Nedder also indicated that her graduate studies were unaffected by her weight and/or conditions related thereto.

_____

[14]At one point during the hearing, defense counsel and plaintiff were discussing an employee data sheet Ms. Nedder completed for Rivier College wherein she marked "No" in response to a question about handicap status. Defendant's Exhibit B. Ms. Nedder explained that she did consider herself as having a handicap "but didn't consider it was a handicap that impacted my job . . . ." Plaintiff elaborated that she has "had difficulty walking for a long time. I don't consider it keeps me from doing my job but I recognize that I'm disabled." (Emphasis added.)

Summarizing the substantially limiting effect of plaintiff's weight on her capacity to work, the court posited,

> The Court: As I understand it, in preparing and teaching all the classes you've taught, whether at Saint Basil's or at Rivier College, <u>your weight hasn't interfered with your preparation and actually teaching classes.</u>
> A: <u>That's correct.</u>

(Emphasis added.) Accordingly, the court finds, on the evidence herein presented, that plaintiff is not substantially limited in the major life activity of working.[15]

---

[15]Although neither briefed nor argued by plaintiff as an alternate theory of recovery, the ADA further provides that an individual may maintain an action pursuant to the statute if she is "regarded as having . . . an impairment." 42 U.S.C. § 12102(2)(c). <u>See also</u> <u>Cook</u>, <u>supra</u>, 10 F.3d at 22; <u>Hamm</u>, <u>supra</u> note 7, 51 F.3d at 724. However, Ms. Nedder has not offered, and the injunction hearing did not uncover, any evidence that anyone among the Rivier College administration regarded her as having an impairment that substantially limited one or more of her major life activities. Rather, Father Murphy testified that he neither discriminated against the plaintiff on any basis or considered plaintiff to be disabled:

> Q. Have you ever considered Mary Nedder to be disabled in any way, Father?
> A. No, I haven't.
> Q. Have you ever, as you sit here today under oath, have you ever discriminated against her on the basis of her weight or any perceived disability?
> A. I have never discriminated against her on any basis.

Dr. Landry supplemented this record by stating that the decision to not renew Ms. Nedder's contract for the '95-'96 academic year

The findings made herein that plaintiff's alleged morbid obesity does not substantially limit her ability to walk or to work necessarily lead to the conclusion that plaintiff is unlikely to succeed on the merits of her ADA claim. However, because plaintiff's ability to walk is clearly affected by her obesity to some degree, and because "the ultimate issue" in every employment discrimination case is whether the plaintiff "has been victimized by intentional discrimination," Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 720 (1st Cir. 1994), the court will also consider herein whether plaintiff is likely to succeed on the merits of that "ultimate issue."

b. Rivier's Justification

At the preliminary injunction hearing, Rivier offered several legitimate, nondiscriminatory reasons for its decision not to renew Ms. Nedder's contract of employment. The primary reasons given at the time were the school's decision not to pursue the Religious Education certificate program and its determination that Ms. Nedder's academic preparation was in that area, whereas the Religious Studies Department needed a

---

was unrelated to plaintiff's weight and any effects associated therewith. Accordingly, the court finds that Ms. Nedder has not been regarded as having an impairment that substantially limits a major life activity.

29

generalist with an advanced degree in theology. These reasons are set forth in the August 19 letter Ms. Nedder received notifying her that her contract would not be renewed. Plaintiff's Exhibit 10; Defendant's Exhibit L. The same reasons are set forth in Father Murphy's undated memorandum entitled "Summary of Thoughts Re: Mary Nedder." Plaintiff's Exhibit 15.

A more detailed explanation of Father Murphy's finding that Ms. Nedder lacked the necessary academic preparation to meet the school's needs is set forth in his August 12 memorandum to Dr. Landry recommending that Ms. Nedder not be rehired. That same memorandum addressed Ms. Nedder's plans for graduate school, which Father Murphy concluded were inappropriate for Rivier's needs.[16] Father Murphy's testimony on these issues was consistent with the documentary evidence provided to the court.

The court finds that Rivier College has articulated at least two legitimate, nondiscriminatory reasons for its decision to terminate Ms. Nedder, both of which are sufficient to meet its burden at this preliminary injunction stage.

_____

[16]Father Murphy's August 12 memorandum also detailed Murphy's "general impressions" of Ms. Nedder. See supra at 10. However, Father Murphy testified that these general impressions were just that and were not reasons for his decision to recommend that Ms. Nedder not be rehired.

c. Plaintiff's Evidence of Discriminatory Animus

In order to show that she is likely to succeed on the merits of her ADA claim, plaintiff must establish that Rivier's articulated reasons for terminating her employment are a pretext for discrimination.

In this circuit, the fact that an individual is hired by the same person who makes the decision to fire her creates a strong inference that the adverse employment decision was not motivated by discriminatory animus. LeBlanc v. Great American Ins. Co., 6 F.3d 836, 847 (1st Cir. 1993), cert. denied, ___ U.S. ___, 114 S. Ct. 1898 (1994). Accord Tyndall v. National Educ. Ctrs., 31 F.3d 209, 214-15 (4th Cir. 1994) ("'[w]hen the hirer and firer are the same individual, there is a powerful inference relating to the "ultimate question" that discrimination did not motivate the employer . . . . '" (quoting Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991))); Lowe v. J.B. Hunt Transp., Inc., 963 F.2d 173, 174-75 (8th Cir. 1992); but see Susie v. Apple Tree Preschool and Childcare Ctr., 866 F. Supp. 390, 396-97 (N.D. Iowa (1993) (cautioning against a general application of such an inference in ADA cases because "the employer's knowledge of [an] employee's disability, the nature and scope of the disability, and the

degree of a required reasonable accommodation may substantially vary after the individual's hiring").

Mary Nedder was first hired by Rivier in 1988 to teach courses offered by the college's Department of Religious Studies on a part-time basis. Father Murphy, who was then a faculty member of the department, testified that he recommended Ms. Nedder be hired for the part-time position. Sister Louise, who was then chair of the department, recommended to Dr. Landry that Nedder be hired, and Dr. Landry approved Sister Louise's recommendation.

In 1992 a search committee was formed to hire a full-time professor of Religious Studies. Both Father Murphy and Sister Louise were members of this committee. The search committee, after examining the credentials of ten applicants, recommended to Dr. Landry that Ms. Nedder be hired for the position. Ms. Nedder's candidacy was also supported by a separate letter of recommendation from Father Murphy.[17]

Ms. Nedder was subsequently interviewed by Dr. Landry, and although Dr. Landry's decision regarding Ms. Nedder is not documented in the record before the court, Ms. Nedder was

_____

[17]Father Murphy was Chair of the Religious Studies Department  at the time he wrote this letter of recommendation.

thereafter appointed as Assistant Professor of Religious Studies by Sister Jeanne Perreault on June 16, 1992.

In August of 1994 Father Murphy, as Chair of the Religious Studies Department, recommended to Dr. Landry that Ms. Nedder's contract not be renewed for the 1995-96 academic year. Plaintiff's Exhibit 5. Ms. Nedder thereafter received written notification that her contract would not be renewed from Dr. Landry and Father Murphy on August 19, 1994. Plaintiff's Exhibit 10; Defendant's Exhibit L.

Two of the key people involved in hiring Ms. Nedder on a part-time basis in 1988 and on a full-time basis in 1992--Father Murphy and Dr. Landry--were the same individuals who decided that Ms. Nedder's contract would not be renewed for the 1995-96 academic year. Further, several individuals testified that Ms. Nedder's weight and physical appearance were approximately the same at the time she was hired as they were when she was terminated.[18] The court finds that this evidence gives rise to a strong inference that the decision not to renew Ms. Nedder's contract was not motivated by discriminatory animus. In order to

_____

[18]Mary Nedder concedes that her appearance was the same at the time she was hired as it was when she was fired, but claims that she was "much more visible" on campus after being hired on a full-time basis.

33

determine whether plaintiff can overcome this inference, the court turns its attention to the evidence presented at the preliminary injunction hearing that plaintiff was terminated because of her alleged disability.

The Fall 1993 Convocation

In support of her claim that she was terminated because of her weight, plaintiff points first to her inability to fully participate in the fall 1993 convocation. Ms. Nedder testified that she was unable to maintain the pace at which the other participants were walking during the convocation's procession, and when her slower pace began to hold up the participants walking behind her, she pulled out of the procession.

Father Murphy made note of Ms. Nedder's inability to "participate fully" in this academic convocation in his memorandum of August 12 to Dr. Landry, recommending that Ms. Nedder not be rehired. Plaintiff's Exhibit 5. Murphy testified at the hearing that Ms. Nedder's inability to participate fully in the convocation "had to do with her going over to the dedication ceremony that occurred on the steps of the new building. . . . At the time I recall she told me that she was

34

having emotional problems with flashbacks and that she felt claustrophobic and panicky in crowds."

The court finds the testimony of both Ms. Nedder and Father Murphy to be credible with respect to what happened at the convocation. The court further finds that Father Murphy's noted concern about Ms. Nedder's inability to fully participate in the convocation was not related to her weight and the resulting difficulty she has walking, but rather was related to the emotional problems he knew her to be experiencing at the time.

### Meetings Regarding Body Odor

Second, Ms. Nedder points to a meeting she had with Dr. Landry in the fall of 1993 in which Dr. Landry "expressed some concern" over the fact that Ms. Nedder had arrived late at a recent faculty meeting, was sweating, and had some body odor. Ms. Nedder testified that she explained to Dr. Landry that, in addition to running late that day, she had gained an extra twenty pounds after her mother's death, which was causing her to sweat more often. Ms. Nedder further testified that

> she [Dr. Landry] encouraged me when I had
> shared about having gained the weight. She
> encouraged me to try to work on losing it and
> she also raised the--I believe as a way of
> support--that even she needed to lose a few
> pounds, and then she told me that she had

35

been thinking about sending me an article
that Sister Jeanne had sent over to her desk
and it talked about the traditional-age
students' response to overweight faculty and
that in this article it said that overweight
students--traditionally students perceived
overweight faculty as being less disciplined,
less intelligent.

Dr. Landry testified that this article, which appeared in the
"Chronicle of Higher Education", a weekly newsletter the college
receives and circulates among the staff, reviewed the preliminary
findings of a study on how traditional-age students react to
obese teachers.[19]


<u>Winter 1994 Office Use and Use of Faculty Secretary</u>

The third incident plaintiff refers to occurred in early
February of 1994 when Ms. Nedder slipped and fell on an icy
walkway on the hill leading up to her office on the Rivier
campus.  Ms. Nedder testified that, because of her weight, she
had trouble getting up and had to crawl over to a nearby wall and
utilize it to pull herself up off the ground.  The following day,
Ms. Nedder again attempted to walk to her office.  However, when

---

[19]Father Murphy also met with Ms. Nedder to discuss her
problem with body odor and her overuse of perfume.  However,
there was no evidence submitted that this meeting was motivated
by Ms. Nedder's weight or that her weight was discussed at the
meeting.

36

the walkway didn't look much better, she panicked and went back to the Memorial Building. Because Ms. Nedder found herself unable to reach her office for about two weeks, she saw students in the Memorial Building rather than in her office during that period of time.

In his memorandum of August 12, Father Murphy notes as one of his "general impressions" that Ms. Nedder was "unable to use [her] office when [there is] snow on the ground." Plaintiff's Exhibit 5. Father Murphy testified that this comment referred to his discovery that Ms. Nedder was not in her office during her scheduled office hours when students came to see her. He further testified that Ms. Nedder had not informed him as to where she would be, which information he needed as chair of the department. Father Murphy denies that his comment has any relation to her weight.

Related to Ms. Nedder's inability to use her office during the winter of 1994, while she was working out of the Memorial Building, Ms. Nedder asked Rivier's faculty secretary to alert her about important telephone calls. Ms. Nedder further testified that the secretary volunteered to do some photocopying for her, and that Ms. Nedder accepted that offer. Although Ms. Nedder was later informed by Father Murphy that this was an

37

"unacceptable use" of the faculty secretary, Ms. Nedder testified that she was unaware at the time that her use of the secretary was inappropriate.

### The 1994 Commencement Exercises

The next incident Ms. Nedder points to is her inability to fully participate in the 1994 commencement exercises because of her concern over the distance she would be required to walk. Father Murphy made the following note about Ms. Nedder in his August 12 memorandum to Dr. Landry: "couldn't participate in commencement procession (claims emotional crisis when in a crowd)." Plaintiff's Exhibit 5. Murphy explained at the hearing that Ms. Nedder told him that "she was experiencing panic attacks when in a crowd of people" and that was the reason she was unable to participate in the commencement procession.

### Sister Jeanne's Comments

Ms. Nedder's evidence of discrimination also includes two incidents involving Sister Jeanne Perreault. The first of these occurred in May of 1994 at a reception and involved some comments made by Sister Jeanne to Valerie Richard, an employee in Rivier's food services department who was working at the reception.

Richard testified that at this reception, while carrying a tray of wine glasses and carafes up a flight of stairs, she lost her footing due to her arthritic knee.  Sister Jeanne was present when this occurred and remarked to Ms. Richard that "if you lost some weight maybe you wouldn't have that problem" and also said "well if you went to Weight Watchers you would relieve the pressure on that knee."[20]  Ms. Richard further testified that she was "devastated" by Sister Jeanne's comments and complained to numerous people on campus about the incident.  Ms. Richard stated during her testimony that Sister Jeanne eventually apologized to her on two separate occasions, the first of which Ms. Richard perceived to be quite insincere.

The second incident involved comments made by Sister Jeanne as part of her "state of the College" address at the August 17, 1994, annual faculty meeting.[21]  When asked about this address, Sister Jeanne testified as follows:

> A. At that meeting I gave a summary of what
> I considered to be key points of the
> college's mission, which is the education of
> the whole person--the education of the mind,
> the heart, the soul, and the body.  I had

---

[20]Sister Jeanne conceded during her testimony that she may have said to Valerie Richard at the May reception, "maybe it [is] time to go to Weight Watchers."

[21]Ms. Nedder was not present at this faculty meeting.

given the same conference or, if you will, the same address to students previously, at orientation. However, at the faculty meeting in my presentation I did speak about the importance of all of these, yes.

Q. Did you also indicate that it was important not to gain weight?

A. I'm not sure that I used those words. I think what I did say at that time was that keeping the body in good form was important. I had recently had an accident and subsequently walked a lot and thought that exercise was very important. I found that exercising for myself was--took a lot of discipline on my part, and I did say to the faculty at that time, I encouraged, as a leader in the community, that keeping one's body in good form was important, but I don't think I stressed body more than I did the mind, and the spirit and the soul, the spiritual aspect of the whole person.

Camille MacKnight, Rivier's payroll and benefits coordinator, attended this faculty meeting and recalled in her testimony that Sister Jeanne spoke of the need "to educate the whole body, the mind, the soul and the body." Ms. MacKnight further testified that the statement about the body, as she heard it, "was that you may need to exercise or lose weight," and when Ms. MacKnight heard this she thought of the Valerie Richard incident and about Mary Nedder. Ms. MacKnight also recalled Sister Jeanne's making similar comments at a subsequent staff meeting and adding that faculty and staff must set examples on campus for students.

Patrice O'Donnell, Associate Professor of Psychology and Chair of Rivier's Behavioral Sciences Department, was also present at the August 17 faculty meeting. Professor O'Donnell testified that Sister Jeanne related a story from several years prior about a graduation speaker named Commodore Hopper who had commented to her that "there are a lot of fat people on this campus." According to Professor O'Donnell, Sister Jeanne used this story anecdotally and went on to discuss the importance of educating the whole person and of faculty and staff being role models both in and out of the classroom.

Brother Paul Demers, Rivier's chaplain and campus minister, also attended the faculty meeting and recalled in his testimony that Sister Jeanne's comments were made in the context of the importance of taking "a holistic approach" to the education of one's mind, spirit, heart, and body. Brother Paul further testified that he "think[s] there was a statement made by Sister Jeanne about being careful of one's weight, being overweight in a sense is an indication of lack of discipline and is or can be perceived in a negative way, and we owe [it] to ourselves to attend to all aspects of our being--body, mind, and spirit." Brother Paul thought at the time that Sister Jeanne's comments were directed toward him because he has trouble with his weight.

The court finds the testimony of each of these witnesses to be credible with respect to Sister Jeanne's comments at the August 17 faculty meeting. The court, having listened carefully to all of the testimony, finds that, due to the context in which Sister Jeanne's comments were made, the comments could have been, and in fact were, interpreted differently by various individuals depending on the personal experiences of those individuals.

Nedder's Competency in the Classroom

The various reports and evaluations of Mary Nedder's performance in the classroom between 1988 and 1994 from both her students and fellow faculty members are consistently excellent. However, in June of 1994, Father Murphy informed Ms. Nedder that advisors had reported to him that students were complaining that Ms. Nedder was "too dogmatic" and "inflexible" and were refusing to enroll in her classes. Father Murphy also advised Ms. Nedder that the student evaluations he had received from her recent "On Being Human" course contained negative remarks. Father Murphy did indicate to Ms. Nedder at this time that the college would "look hard" at renewing her contract if the concerns raised by the student advisors could not be resolved.

The court's review of the student evaluations mentioned above, Plaintiff's Exhibit 7, reveals that the majority of student comments about Ms. Nedder's "On Being Human" course were positive rather than negative.  However, there are numerous negative comments contained therein, the presence of which justifies Father Murphy's decision to reevaluate Ms. Nedder's overall qualifications and performance.  This is particularly true where, as here, Ms. Nedder was a probationary employee.[22] See infra p. 45.

### Conclusions as to Plaintiff's Evidence of Discrimination

There is, without a doubt, some evidence here from which a reasonable jury might infer that the decision of Rivier College to terminate Mary Nedder's employment was based on her weight and that the other reasons given for her termination were a pretext. However, the court, having carefully considered all of the documentary evidence submitted and testimony given at the hearing in this matter, concludes that plaintiff has not shown that she is likely to succeed on the merits of this element of her case.

---

[22]The Faculty Handbook, which governed Ms. Nedder's employment, states at section 3.5.1, "All initially ranked faculty appointments are probationary.  Hence, both parties engage in mutual evaluation during this period."  Defendant's Exhibit DD.

Accordingly, the court further concludes that plaintiff has failed to show that she is likely to succeed on the merits of her ADA claim.

3. Irreparable Harm

Ms. Nedder asserts that she has suffered and will continue to suffer irreparable harm because of defendant's decision not to renew her contract. Specifically, Ms. Nedder asserts that she "has suffered humiliation, loss of reputation, and an inability to earn a living in her chosen profession." Plaintiff's Motion for Preliminary Injunction at 2.

It is well established that "temporary loss of income, which can be recouped at the end of a trial, 'does not usually constitute irreparable injury.'" Gately v. Massachusetts, 2 F.3d 1221, 1232 (1st Cir. 1993) (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974)), cert. denied, ___ U.S. ___, 114 S. Ct. 1832 (1994). Therefore, the fact that Ms. Nedder is currently unemployed and unable to earn a living in her chosen profession does not constitute irreparable harm.

With regard to Ms. Nedder's loss of reputation, she testified that defendant's decision has "pretty much shredded" her reputation in "academic circles" and that her efforts to gain

44

other employment have been unsuccessful.  The court's determination as to whether the injury to Ms. Nedder's reputation rises to the level of irreparable harm such that injunctive relief is warranted is necessarily a fact-specific inquiry.

Here, on the basis of this court's review of the Rivier College Faculty Handbook, Defendant's Exhibit DD, and the testimony of Dr. Landry, who authored the handbook, the court concludes that Ms. Nedder was a probationary faculty member.  As such, Rivier could decide not to reappoint her for any reason, and was "not required to set forth its reasons" for doing so.  Faculty Handbook § 3.5.5.  In addition, plaintiff was not dismissed "for cause."  See Faculty Handbook § 3.55 ("[n]on-reappointment should not be confused with dismissal for cause").  Plaintiff's situation is distinguishable in this respect from one in which an adverse employment decision is made against a tenured professor, cf. Silva v. University of N.H., 888 F. Supp. 293, ___, Civ. No. 93-533-SD, 1994 U.S. Dist. LEXIS 13281, *99-*100 (Sept. 15, 1994), or one in which a professor has been denied tenure.  Cf. EEOC v. Tufts Institution of Learning, 421 F. Supp. 152, 163 (D. Mass. 1975) (finding that the harm and injury to a professor from a university's decision denying her tenure to be

45

irreparable due to the professor's age and the preference in her field for younger faculty members).

Although Rivier has submitted evidence of several reasons why Ms. Nedder was not reappointed, the reason set forth in the August 19, 1994, letter notifying her of such decision is that Rivier had decided not to pursue the certificate program in Religious Education, which is Ms. Nedder's "area of expertise", and that the college found its "needs at the present time center about [its] core curriculum which is best served by a generalist in this area."  Plaintiff's Exhibit 10; Defendant's Exhibit L.

The court finds that the reputational injury suffered by Ms. Nedder under these circumstances "'falls far short of the type of injury which is a necessary predicate to the issuance of a temporary injunction in this type of case.'"  Gately, supra, 2 F.3d at 1232 (quoting Sampson, supra, 415 U.S. at 91-92).  The court therefore finds and rules that Nedder has not met her burden of proving that she has suffered or will suffer irreparable harm if she is not reinstated pending a determination on the merits of the case.

4.  Balance of the Relevant Equities

The third factor the court must consider in determining whether Ms. Nedder is entitled to preliminary injunctive relief

46

involves "a balancing of the relevant equities, *i.e.*, 'the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld.'" Gately, supra, 2 F.3d at 1224 (quoting Narragansett Indian Tribe, supra, 934 F.2d at 5).

The hardship to Ms. Nedder if interim relief is withheld is that she will not be teaching at Rivier and will suffer a corresponding loss of income during the pendency of this action. In contrast, requiring Rivier College to reinstate Ms. Nedder while this lawsuit continues imposes a burden on the college of having to allow Ms. Nedder to teach courses in its Religious Studies Department despite the school's determination that she does not have the academic preparation necessary for such a professor. Otherwise stated, the injunction requested "surrenders the university's academic autonomy to a federal district court." Vargas-Figueroa v. Saldana, 826 F.2d 160, 162 (1st Cir. 1987). Further, Rivier College would not be able to "recover compensation for the loss of freedom to conduct its affairs while the injunction [requested by Ms. Nedder] was in effect." Id. at 163.

Acknowledging that "[c]ourts have wisely recognized the importance of allowing universities to run their own affairs (and

to make their own mistakes)", id. at 162, the court finds that the balance of the relevant harms in this particular case weighs against the reinstatement of Ms. Nedder to the position of Assistant Professor of Religious Studies at Rivier.

5.  The Effect on the Public Interest

The final factor in the First Circuit's four-part preliminary injunction test requires the court to consider "the effect on the public interest of a grant or denial of the injunction." Gately, supra, 2 F.3d at 1224.

One of the purposes of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities . . . ." 42 U.S.C. § 12101(b)(1). Thus, the ADA clearly reflects the public's interest in eradicating employment discrimination against individuals with disabilities.

Here, however, Ms. Nedder has not proven to the court's satisfaction that she is likely to succeed on the merits of her ADA claim. Under such circumstances, the court finds that the public's interest in eradicating employment discrimination is outweighed by its countervailing interest in allowing higher education institutions to "run their own affairs" without

48

unnecessary interference from the courts. <u>Vargas-Figueroa</u>, <u>supra</u>, 826 F.2d at 162; <u>see also</u> <u>Williams v. State Univ. of New York</u>, 635 F. Supp. 1243, 1251 (E.D.N.Y. 1986) ("'of all fields which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal intervention.'" (quoting <u>Moore v. Kibbee</u>, 381 F. Supp. 834, 839 (E.D.N.Y. 1974))).

## Conclusion

For the reasons set forth herein, plaintiff's motion for a preliminary injunction (document 5) is denied.

All requests for findings of fact and rulings of law which are not hereinabove inferentially granted are herewith denied.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

August 14, 1995

cc:  Paul McEachern, Esq.
     Daniel P. Schwarz, Esq.

49